**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KYLE RAYOME,** ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ABT ELECTRONICS, INC.,** ) | **JURY TRIAL DEMANDED** |
| **an Illinois Corporation,** ) | |
| *Defendant.* ) | |

## COMPLAINT

Plaintiff, Kyle Rayome by and through his attorneys, complains of Defendant, Abt Electronics, Inc., as follows.

### NATURE OF THE ACTION

1.      Plaintiff brings this action against his former employer, Abt Electronics, Inc., with whom he had worked for some twenty years to rectify the company's actions in interfering with and retaliating against him for exercising his rights under the Family and Medical Leave Act to take time away from his work to care for and support his son's disability-related medical needs, and discriminating against him on account of that association and on account of his own disability, which developed as a result of his mistreatment by Abt.

### JURISDICTION AND VENUE

2.      Jurisdiction is provided by 28 U.S.C. §1331, as the claim involves a violation of the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.* and violations

of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*., as amended. The Court has supplemental jurisdiction for state law claims pursuant to 42 U.S.C. §1367(a).

3. Plaintiff has timely filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"). The charges are currently under investigation.

4. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to this action occurred within this judicial district.

**PARTIES**

5. Plaintiff, Kyle Rayome, an individual, is a citizen of the State of Illinois and resident of Lake County who was formerly employed by Defendant, Abt Electronics, Inc.

6. At all times relevant hereto, Plaintiff was an eligible employee under the Family Medical Leave Act ("FMLA"), as he worked for the Defendant for approximately twenty years and worked more than 1250 hours per year.

7. Defendant, Abt Electronics, Inc. (hereinafter sometimes referred to as "Abt"), is an Illinois corporation with approximately 1,500 employees regularly conducting business throughout the State of Illinois, including from its principal place of business in Cook County at 1200 Milwaukee Ave, Glenview, Illinois.

8. At all times relevant hereto, Defendant was a covered employer under the Family and Medical Leave Act, the Americans with Disabilities Act ("ADA"), and

the Illinois Human Rights Act.

## FACTUAL ALLEGATIONS

*Excellent Performance for Over 20 Years*

9.     Mr. Rayome had been an Abt salesperson for more than 20 years and consistently excelled throughout that long tenure.  Hired in April 2000 to sell small electronics, Mr. Rayome was quickly promoted to selling audio, then to selling the premier Bang & Olufsen brand, and then to custom audio.

10.     Mr. Rayome was eventually advanced and given the title of Corporate Sales Account Executive. By 2016, Mr. Rayome had generated new revenue exceeding $10,000,000 and was one of the top salespeople in the entire company.

11.     The sales portfolio that Mr. Rayome developed in his time with Abt  was one of the largest ever compiled in Abt's 84-year history. The portfolio exceeded $12,000,000 in sales annually, and his accounts included: ABC/Disney/ESPN, Allstate, Tesla, Enjoy Technology, Ford Group, Tristate Camera, Fulton Grace Realty, Atbiz, Des Plaines Library, Hartz Construction, Valenti Builders, Hyundai, KC Electronics, Links, Anthony Marano Company, Pathway Senior Living, MakeshopeNcompany, Saint Anthony Hospital, Security Data Supply, SRE Holdings, US Tool, Veterans Affairs, Villa St. Benedict, Wintrust, Xtreme Network, and Perkspot.

12.     Mr. Rayome won Abt's annual sales contest multiple times and routinely ranked as a Top 10 seller in the company's 200-person sales team; he consistently

increased sales and had been the national top seller for key brands.

13.     Mr. Rayome consistently demonstrated an ability to bring in new sales using creative approaches. He worked with Abt's marketing team to deploy marketing campaigns with major national brands including Allstate, Disney, Tesla, Hyundai, CDW, Southwest Airlines, PGA, and United Airlines, and he responsible for the development of three highly successful new departments: Audio/Video for builders, Corporate Sales, and the Bang & Olufsen Department that at one time ranked in the top 20 globally.

14.     In Mr. Rayome's 2015 performance review, his manager, Tim Steward, noted that Mr. Rayome "does a great job of finding ways to bring in sales and business and regularly thinks 'outside the box' as to ways to do this." The following year, Mr. Steward reiterated that Mr. Rayome "continues to bring in business in non traditional (for Abt) ways."

15.     The most recent substantive performance review included in Mr. Rayome's personnel file was from October 2018. His manager at the time, Marc Spiwak, rated him as "Exceeding Expectations" in every category. He raved that he "could not be more satisfied," remarking that Mr. Rayome's sales numbers somehow grew "despite having issues on his personal side." Mr. Rayome, Mr. Spiwak proclaimed, had "an exceptional knowledge of all product lines," was "organized to a tee," wastes no time, was "always looking to better the store," and was "always looking for a solution." Mr. Spiwak lauded Mr. Rayome, stating, "Within our team, Kyle is excellent."

16.    Earlier performance reviews from a another manager, Mr. Steward, similarly praised Mr. Rayome's product knowledge, initiative, and problem-solving ability, noting in his 2016 performance review, "Kyle is one of the top performers in the department and store as a whole."

*Cancer at Home & FMLA*

17.    In May 2017, Mr. Rayome's son was diagnosed with Ewing Sarcoma, a rare form of bone cancer that requires aggressive chemotherapy and other interventions to treat. This treatment required multiple months of chemotherapy, as well as lung surgery in June 2017, and shoulder resection surgery in November 2017.

18.    In addition to handling the emotional stress caused by his son's cancer diagnosis, Mr. Rayome had to take the time to accompany his son to countless doctor's appointments and hospital visits while also supporting the care for him when he was home.

19.    After a year of chemotherapy treatment, Mr. Rayome's son's original tumor was removed, though it was expected that the effects of the intense chemotherapy would still require a long recovery. Unfortunately, the chemotherapy caused even more significant damage and his medical condition worsened. In February of 2019, Mr. Rayome's son was diagnosed with a new and extremely rare form of cancer, Ewing Sarcoma Therapy-Related Acute Lymphoblastic Leukemia. One of only 50 such cases ever recorded, his son's treatment required FDA approval.

Approximately 96% of his son's bone marrow had been infected with cancer as a result of his prior treatment.

20.     Treating the new cancer would also require aggressive, weekly chemotherapy, as well as near-constant home care for, and monitoring of, his son by his parents. As Mr. Rayome later explained in an email to Abt managers, the aggressive chemotherapy destroyed his son's immune system, meaning that even a minor ailment like a nosebleed or a cold could be fatal to him.

21.     Mr. Rayome knew that he would need to spend more time at home to assist in caring for his son, but he feared retaliation from Abt. He had been reprimanded in August 2018 because a project took longer than expected while Mr. Rayome was out of the office on an approved day off to attend a Make-A-Wish Foundation event for his son.

22.     As well, he had recently heard Abt President Ricky Abt dismiss Mr. Rayome's struggles as routine, remarking, "everyone has personal problems."

23.     On February 13, 2019, Mr. Rayome emailed Abt management, asking for patience as he balanced the pressures and time commitments at work and at home.

24.     Then, in late February 2019, after his son officially received the new diagnosis, Mr. Rayome formally submitted a request for intermittent leave under the FMLA so that he could be at home or available to assist in the daily care and support of his son.

*Abt Learning Letters and Bonus Deductions*

25.     As a salesman, Mr. Rayome was paid a base salary plus commissions. Additionally, every quarter he was enrolled in a bonus fund, which was set up for each person in sales.

26.     Managers for the company were then permitted, in their sole discretion, to issue bonus deductions from the sales person's account for any reason they saw fit. The bonus deductions were accompanied by a write-up, which the company called a "Learning Letter", which letter was also sent to all of the Abt managers, purporting to justify the basis for the bonus deduction.

27.     Employees could contest the deduction and request a retraction from the manager who issued the discipline, but the manager retained complete discretion whether or not to do so.

28.     Abt takes the number of Learning Letters issued and the deductions into consideration when deciding whether or not to terminate employees.

*Learning Letters After FMLA Use & Plaintiff's Complaints*

29.     It was in May of 2019 that Mr. Rayome first took significant time away pursuant to his FMLA request, after his son suffered a seizure in April 2019 and over the course of the next two months required both additional emergency and additional routine visits to the hospital.

30.     While Mr. Rayome was out on leave, Abt issued a disciplinary "Learning

7

Letter" and docked his bonus pay for not following up with a customer about an estimate during the time he was out on leave.

31.    The day after that disciplinary letter, Mr. Rayome attempted to access the company VPN only to be told by the IT department that his VPN access had been shut off at the instruction of Ricky Abt, which prevented him from working from home.

32.    Shortly thereafter, in June 2019, Mr. Rayome continued to take intermittent time away to support and care for his son and in consequence Ricky Abt issued two more pretextual Learning Letters to Mr. Rayome and docked his bonus each time.

33.    Even after Mr. Rayome submitted emails showing the asserted bases for the deductions were groundless, Ricky Abt still refused to retract them.

34.    The day he received the second unfounded Learning Letter and bonus deduction from Ricky Abt, Mr. Rayome complained to the Abt Human Resources Department that the company was retaliating against him for exercising his rights under the FMLA.

35.    A meeting was held about Mr. Rayome's complaint the next day.  In the meeting with Mr. Rayome was Becky Stavin from HR but also three of the company's owners, Ricky Abt, Billy Abt, and Jon Abt.

36.    During the meeting, Ricky Abt dismissed the severity of Mr. Rayome's son's cancer and the level of care and support required of Mr. Rayome by flippantly asserting, as he had done in the past, that everyone has "personal problems."

8

37. Also during this meeting, in response to Mr. Rayome's complaints, Ricky Abt attacked Mr. Rayome, calling him a "snake" and a "moron", accusing him of playing games, and of being antisemitic.

38. Mr. Rayome was then told the company was taking away a $250 monthly bonus he had earned for sales volume, even though that bonus would remain for the others in the sales department.

39. Throughout the course of the meeting, Abt's HR personnel, Becky Stavin, said nothing.

*The Reprisals Continue*

40. It did not end there, unfortunately. Mr. Rayome's continued requests for FMLA leave to care for his son, his use of that FMLA leave entitlement, and his complaints about retaliation for taking FMLA leave only resulted in additional waves of Learning Letters and deductions from his bonus fund, in addition to other retaliatory conduct.

41. In August of 2019, for example, Mr. Rayome had to take nine days of FMLA leave away from work for his son's care only to be served with another Learning Letter and a $450 bonus deduction, by Michael Abt, for not responding to a customer while he was away on FMLA leave.

42. Then again, near the end of 2019, Mr. Rayome requested and took more FMLA leave time away from work and, on New Year's Day, Abt Vice-President Phil Hannon issued a pretextual Learning Letter and $650 in deductions from Mr. Rayome's bonus fund, for which act he was praised by Ricky Abt in a response to all

9

managers.

43.     Two days later, on January 3, 2020, Mr. Rayome sent an email to Billy Abt, complaining about his treatment since taking FMLA leave to care for his son, but the retaliation only continued.  When his manager, Tim Steward, learned that he had complained, the number of Learning Letters and bonus deductions only increased, as did other acts of retaliation.

44.     Mr. Rayome discovered, in early February of 2020, that Abt managers had been secretly taking business (and thus commissions) away from him by failing to credit him for purchases made on his accounts and, on February 6, 2020, Mr. Steward issued him another unfounded Learning Letter with a $400 bonus deduction because of a product exchange that Mr. Rayome had nothing to do with.

45.     Once again, Mr. Rayome attempted to enlist the aid of Billy Abt, asking him to put a stop to Ricky Abt's retaliation and insults.

46.     The next day, February 7, 2020, Ricky Abt accosted Mr. Rayome in the Customer Service area, which opens up to the sales floor. In front of employees and customers, Ricky Abt said his brother had told him of Mr. Rayome's report of harassment and reprisal by Ricky Abt and the request for it to stop.

47.     He then aggressively demanded that Mr. Rayome stop making complaints about him.  Ricky Abt threatened that he would not tolerate any more complaints from Mr. Rayome about how he was being treated or about harassment.

48.      Ricky Abt, bizarrely, even went so far as to proclaim that he should be the one to file an harassment complaint *against Mr. Rayome*.

49.     As part of this threat, Ricky Abt, who is much taller and bigger than Plaintiff, moved to physically intimidate Mr. Rayome by encroaching into his personal space and staring him down for an extended time and in such a menacing way to the point that Mr. Rayome feared that Ricky Abt was going to physically attack him.

50.     Following Ricky Abt's physical and verbal assault and attempt to humiliate Mr. Rayome in front of his co-workers and customers, Mr. Rayome broke down in tears.

51.     Billy Abt apologized to Mr. Rayome for his brother's behavior, but just three days later Ricky Abt issued to Mr. Rayome yet another Learning Letter and a $200 bonus deduction, this time for failing to give Ricky Abt's friends a big enough discount on their appliance purchase, which Ricky Abt claimed was "horrible" and "embarrassing for the company."

52.     Five days later, Mr. Rayome received another Learning Letter and a $125 bonus deduction for failing to schedule an order delivery while he was away on FMLA leave.

### _Disability Diagnosis_

53.     In the spring of 2020, when the COVID-19 pandemic reached the United States, Mr. Rayome's son was incredibly vulnerable because of his severely compromised immune system and his doctors requested that Mr. Rayome be permitted to work remotely, which only resulted in further acts of reprisal by Abt.

11

54.    The corporate sales assistant was directed by Tim Steward to stop assisting Mr. Rayome and that she was to give priority to other accounts and only work with him if she had time leftover in the week.  More pretextual and baseless Learning Letters, and bonus deductions, were again issued to him in April and in May of 2020.

55.    In May of 2020, the discriminatory treatment, interference with and reprisals for FMLA leave he encountered at work along with the burden of the care and support for his son were too much for Mr. Rayome and he sought mental health treatment.

56.    Though Mr. Rayome had been dealing with increasing anxiety over the course of the previous year due to harassment at work, by May 2020, the anxiety had become so extreme that Mr. Rayome was suffering from panic attacks, heart arrhythmia, chest pain, lack of sleep, and depression. The anxiety and its physical manifestations made it difficult for Mr. Rayome to concentrate, sleep, and perform his work.

57.    Mr. Rayome was diagnosed with Generalized Anxiety Disorder and on May 26, 2020, submitted a letter to Abt from his treater recommending that he be permitted time away from work to mitigate the adverse effects of his condition; a FMLA certification for this condition was completed and submitted to Abt.

_Retaliation and Discrimination Continue_

58.    Following the disclosure of his own serious, disabling, medical condition

and request for accommodation, Mr. Rayome was issued three more baseless Learning Letters and bonus deductions in June and July of 2020, which Ricky Abt would often use as an opportunity to make disparaging remarks about Mr. Rayome.

59.     On July 10, 2020, Mr. Rayome again complained, emailing detailed examples to Becky Stavin in HR and noting, "Neither the harassment, discrimination, or retaliation claims were addressed or resolved" and "in the months following (the June 2019 meeting) all have continued and unfortunately increased in frequency."

60.     Mr. Rayome concluded his email, "Per Abt's discrimination policy I am reporting (4th time) discrimination, harassment, and an unprofessional work environment. Contrary to Abt's discrimination policy, supervisory personnel have not acted to rectify and have responded with retaliation."

61.     Mr. Rayome shortly thereafter requested several days off for his own FMLA leave, which request was denied.

62.     Defendant then announced changes to certain policies that specifically targeted Mr. Rayome.  Mr. Rayome was advised that, even though he was approved for intermitted FMLA, he was to provide a minimum of 7 days advance notice before taking FMLA leave and failure to comply with the notice could result in termination.

63.     Mr. Rayome was also told that the company was putting in a new requirement for corporate sales such that anyone who was below $500,000 in sales on a three-month rolling average would be required to do extra work taking calls or on-line chat requests.

64.     As the only person in corporate sales who had taken FMLA leave or time away for to treat his disability in the previous three months, Mr. Rayome was the only one with volume below the new threshold and the only one to whom the new policy would apply.

65.     Mr. Rayome then submitted another request to take FMLA leave so he could better deal with his increasingly severe anxiety disorder caused largely by the hostility and retaliation he was experiencing from Abt and its managers.  A short time later, on August 6, 2020, Mr. Steward issued  another Learning Letter and bonus deduction to Mr. Rayome.

66.     The pattern of pretextual and baseless Learning Letters and bonus deductions would continue through the remainder of 2020 and beyond.

_EEOC Charges & Termination of Employment_

67.     On October 16, 2020, Mr. Rayome filed and Charge of Discrimination with the EEOC, alleging disability discrimination and retaliation, which charge is cross-filed with the Illinois Department of Human Rights.

68.     Shortly thereafter, Mr. Rayome was told by his manager that the manager would be conducting a performance review, even though an annual review should have been done some seven months earlier in April.

69.     The reprisals continued and following yet another Learning Letter and docked bonus in December, Mr. Rayome again emailed a complaint to Becky Stavin in HR, "Pursuant to Abt Policy Statement Regarding Discrimination I am reporting

14

actions below…Abt continues to manipulate the Learning Letter system to discriminate and harass."

70.     Defendant's discriminatory and retaliatory conduct continued even after the filing of the EEOC Charge and Plaintiff's December complaint and would ultimately lead to the termination of his employment.

71.     In February of 2021, Mr. Rayome had reached agreement for a large sale of electronics and submitted an order, but Abt's purchasing manager cancelled the order and refused to complete Mr. Rayome's sale.

72.     The purchasing manager also issued a Learning Letter to Mr. Rayome and docked his bonus pay on account of this cancelled order.

73.     A couple of weeks later, in March of 2021, Mr. Rayome discovered that, while refusing to allow him to complete his sale (or to fulfill a second order Mr. Rayome had completed after the first order was cancelled) the purchasing manager had, instead, given the products to another salesman who then sold the products to his own customer.

74.     Mr. Rayome discovered this when he noticed the sales invoice on Abt's computerized sales system, which was open to all sales department members.

75.     Believing the invoice to be evidence supporting his claims of discrimination and retaliation, Mr. Rayome emailed himself a copy of the invoice, intending it to be used in connection with the claims set out in his EEOC Charge of Discrimination.

76.     Defendant, clearly monitoring Mr. Rayome's email account, had a

manager challenge him as to what he was doing emailing himself that invoice.

77.     Mr. Rayome responded  that he was saving it for review by his attorney because he thought it related to his EEOC claims.

78.     Abt immediately retaliated by placing Mr. Rayome on an administrative suspension, cutting him off from the company computer systems, and instructing him to have no contact with any of its employees or customers.

79.     Then, a few days later, on March 31, 2021, Respondent terminated Mr. Rayome's employment, pretextually alleging misconduct for emailing himself a copy of the invoice as well as for newly asserted pretextual claims of prior misconduct, which it claimed occurred back in 2016, 2017, and 2018 – 3 to 5 years before his termination.

80.     Mr. Rayome filed a second Charge of Discrimination with the EEOC, which is also to be cross-filed with the IDHR.

81.     As a result of Defendant's actions, Plaintiff has suffered lost wages and other benefits, loss of professional opportunities, damage and risk of damage to his career and reputation, severe embarrassment, emotional distress, pain, suffering, humiliation, fear, anxiety, and loss of enjoyment of life.

## COUNT I
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT

82.     Plaintiff re-alleges paragraphs 1 through 81 and incorporates them as though fully set forth herein.

16

83.     The Family and Medical Leave Act, specifically 29 U.S.C. §2615, makes it unlawful for an employer to discriminate or retaliate against any employee for exercising his rights under the FMLA.

84.     The Family and Medical Leave Act, specifically 29 U.S.C. §2615, also makes it unlawful for an employer "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights under the FMLA.

85.     By its conduct alleged herein, Defendant violated the FMLA and discriminated and retaliated against Plaintiff for having exercised rights to which he was entitled under the FMLA.

86.     Defendant further unlawfully interfered with Plaintiff's rights under the FMLA when it terminated his employment, thereby preventing him from exercising any further entitlement to benefits under the FMLA, including time off for future treatment for his or his son's serious health condition.

87.     Defendant's conduct toward Plaintiff illustrated a willful and/or reckless disregard of Plaintiff's rights under the FMLA.

88.     Plaintiff demands to exercise his right to a jury trial of this matter.

**WHEREFORE**, Plaintiff respectfully requests that this Court find in his favor and against Defendant on Count I as follows:

a) Declare that Defendant's conduct was in violation of the Family and Medical Leave Act, and enjoin all officers, agents, employee and all persons in active concert or participation with them from engaging in further unlawful conduct prohibited by the FMLA;

b) Enjoin Defendant and all officers, agents, employees, and all persons in active concert or participation with it to institute and carry out all policies and practices to provide equal employment opportunities for all and to prevent discrimination;

c) Order Defendant to reinstate Plaintiff to a position equal to or greater than his former position; or, in the alternative, award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;

d) Award Plaintiff pre-judgment interest and additional damages to offset the tax liability on the value of compensation and benefits lost, and which he will lose in the future, as a result of Defendant's unlawful conduct;

e) Award Plaintiff the value of all compensation and benefits lost, and which he will lose in the future, as a result of Defendant's unlawful conduct;

f) Award Plaintiff liquidated damages;

g) Award Plaintiff reasonable attorney's fees, costs, and disbursements; and

h) Award Plaintiff any and all other relief as the Court deems just in the premises.

## COUNT II
## VIOLATIONS OF THE AMERICANS WITH DISABILTIES ACT

(Pending Issuance of Notice of Right to Sue)

89. Plaintiff realleges Paragraph 1 through 81 and incorporates them as though fully set forth herein.

90. Title I of the Americans with Disabilities Act, specifically 42 U.S.C. §12101 *et seq.*, makes it unlawful to discriminate against an employee on the basis of an employee's disability, because of a record of disability, or because the employer regards the employee as suffering from a disability.

91. Title I of the Americans with Disabilities Act, specifically 42 U.S.C. §12101 *et seq.*, further makes it unlawful for an employer to fail or refuse to accommodate an employee's disability.

92.     The Americans with Disabilities Act also makes it unlawful for an employer, an employee, or any agent of an employer to discriminate or retaliate against an employee because he has opposed any unlawful employment practice or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing pursuant to the Act.

93.     By its conduct as alleged herein, Defendant discriminated against Plaintiff because of his disability, because of his record of a disability, and/or because it regarded him as an individual with a disability and retaliated against Plaintiff for exercising his rights under the ADA in opposing and reporting an unlawful employment practice and participating in an ADA investigation or proceeding.

94.     Defendant's conduct toward Plaintiff illustrates a willful and/or reckless disregard of Plaintiff's right to be free from impermissible disability discrimination.

95.     Plaintiff demands to exercise his right to a jury trial of this matter.

**WHEREFORE**, Plaintiff respectfully requests that this Court find in his favor and against Defendant on Count II as follows:

a)  Declare that Defendant's conduct was in violation of the Americans with Disabilities Act, as amended, and enjoin all officers, agents, employee and all persons in active concert or participation with them from engaging in further unlawful conduct prohibited by the ADA;

b)  Enjoin Defendant and all officers, agents, employees, and all persons in active concert or participation with it to institute and carry out all policies and practices to provide equal employment opportunities for all and to prevent discrimination;

c)  Order Defendant to reinstate Plaintiff to a position equal to or greater than his former position; or, in the alternative, award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;

d) Award Plaintiff any applicable compensatory damages, including but not limited to the value of all past and future lost compensation and benefits as a result of Defendant's unlawful conduct, as well as for emotional distress;

e) Award Plaintiff pre-judgment interest and additional damages to offset the tax liability on the value of compensation and benefits lost, and which he will lose in the future, as a result of Defendant's unlawful conduct;

f) Award Plaintiff reasonable attorney's fees, costs, and disbursements; and

g) Award Plaintiff any and all other relief as the Court deems just in the premises.

## COUNT III
## ASSOCIATIONAL DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILTIES ACT

(Pending Issuance of Notice of Right to Sue)

96.     Plaintiff realleges Paragraph 1 through 81 and incorporates them as though fully set forth herein.

97.     Title I of the Americans with Disabilities Act, specifically 42 U.S.C. §12112, makes it unlawful to "deny equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."

98.     By its conduct as alleged herein, Defendant discriminated against Plaintiff because of his association with his disabled son.

99.     Defendant's conduct toward Plaintiff illustrates a willful and/or reckless disregard of Plaintiff's right to be free from impermissible associational disability discrimination.

20

100.    Plaintiff demands to exercise his right to a jury trial of this matter.

**WHEREFORE**, Plaintiff respectfully requests that this Court find in his favor

and against Defendant on Count III as follows:

a)  Declare that Defendant's conduct was in violation of the Americans with Disabilities Act, as amended, and enjoin all officers, agents, employee and all persons in active concert or participation with them from engaging in further unlawful conduct prohibited by the ADA;

b)  Enjoin Defendant and all officers, agents, employees, and all persons in active concert or participation with it to institute and carry out all policies and practices to provide equal employment opportunities for all and to prevent discrimination;

c)  Order Defendant to reinstate Plaintiff to a position equal to or greater than his former position; or, in the alternative, award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;

d)  Award Plaintiff any applicable compensatory damages, including but not limited to the value of all past and future lost compensation and benefits as a result of Defendant's unlawful conduct, as well as for emotional distress;

e)  Award Plaintiff pre-judgment interest and additional damages to offset the tax liability on the value of compensation and benefits lost, and which he will lose in the future, as a result of Defendant's unlawful conduct;

f)  Award Plaintiff reasonable attorney's fees, costs, and disbursements; and

g)  Award Plaintiff any and all other relief as the Court deems just in the premises.

## COUNT IV
## <u>VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT</u>

(Pending Issuance of Notice of Right to Sue)

101.    Plaintiff realleges Paragraph 1 through 81 and incorporates them as though fully set forth herein.

102.    The Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*, makes it unlawful to discriminate against an employee on the basis of an employee's disability.

103.    The Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*, further makes it unlawful to fail or refuse to accommodate an employee's disability.

104.    The Illinois Human Rights Act also makes it unlawful for an employer, an employee, or any agent of an employer to discriminate against an employee because he has opposed any unlawful employment practice or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing pursuant to the Illinois Human Rights Act.

105.    By its conduct as alleged herein, Defendant discriminated against Plaintiff because of his disability and retaliated against Plaintiff for exercising his rights under the IDHR in opposing and reporting an unlawful employment practice and participating in an investigation or proceeding under the Act.

106.    Defendant's conduct toward Plaintiff illustrates a willful and/or reckless disregard of Plaintiff's right to be free from impermissible disability discrimination.

107.    Plaintiff demands to exercise his right to a jury trial of this matter.

**WHEREFORE**, Plaintiff respectfully requests that this Court find in his favor and against Defendant on Count IV as follows:

a) Declare that Defendant's conduct was in violation of the Illinois Human Rights Act, and enjoin all officers, agents, employee and all persons in active concert or participation with them from engaging in further unlawful conduct prohibited by the IHRA;

b) Enjoin Defendant and all officers, agents, employees, and all persons in active concert or participation with it to institute and carry out all policies and practices to provide equal employment opportunities for all and to prevent discrimination;

c) Order Defendant to reinstate Plaintiff to a position equal to or greater than his former position; or, in the alternative, award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;

d) Award Plaintiff pre-judgment interest and additional damages to offset the tax liability on the value of compensation and benefits lost, and which he will lose in the future, as a result of Defendant's unlawful conduct;

e) Award Plaintiff any applicable compensatory damages, including but not limited to the value of all past and future lost compensation and benefits as a result of Defendant's unlawful conduct, as well as for emotional distress;

f) Award Plaintiff reasonable attorney's fees, costs, and disbursements; and

g) Award Plaintiff any and all other relief as the Court deems just in the premises.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.    Plaintiff re-alleges paragraphs 1 through 81 and incorporates them as though fully set forth herein.

109.    Defendant's actions to manipulate the Learning Letter system to punish Plaintiff for needing time away from work to offer care and support for his son who

was suffering from an exceedingly rare cancer and to use its position of power and authority over him to publicly threaten, coerce and humiliate him is manifestly extreme and outrageous.

110.    Moreover, Defendant's actions were plainly intended to cause Plaintiff severe emotional distress and its owners and managers certainly knew that there was a high probability that their conduct would and did, in fact, cause him severe emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Court find in his favor and against Defendant on Count V as follows:

a) Declare that Defendant's conduct was extreme and outrageous;

b) Declare that Defendant intentionally inflicted emotional distress on Plaintiff;

c) Award Plaintiff any applicable compensatory damages, including but not limited to the value of all past and future lost compensation and benefits as a result of Defendant's unlawful conduct, as well as for emotional distress; and

d) Award Plaintiff any and all other relief as the Court deems just in the premises.

Respectfully submitted,

/s/ John P. Madden
Attorney for the Plaintiff

John P. Madden
M. Megan O'Malley
O'Malley & Madden, p.c.
542 So. Dearborn Street, Suite 660
Chicago, Illinois 60605
(312) 697-1382
ARDC No. 6243400
jmadden@ompc-law.com